UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

ROBERT MOORE,                           :

                      Petitioner,       :    04 Civ. 2965 (GBD)(HBP)

     -against-                          :    REPORT AND
                                             RECOMMENDATION
THE STATE OF NEW YORK,                  :

                      Respondent.       :

----------------------------------X


          PITMAN, United States Magistrate Judge:


          TO THE HONORABLE GEORGE B. DANIELS, United States

District Judge,


I.    Introduction


          Petitioner Robert Moore seeks, by his pro se petition

for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, an

Order vacating a judgment of conviction entered on May 15, 2000,

after a jury trial, in the Supreme Court of the State of New

York, New York County (Kahn, J.), for one count of criminal sale

of a controlled substance in the third degree and one count of

criminal sale of a controlled substance near a school ground, in

violation of New York Penal Law Sections 220.39 and 220.44

respectively.  By that judgment, petitioner was sentenced to an

indeterminate term of imprisonment of four and one-half to nine

years.  Petitioner was released on parole at the time he filed

his petition for a writ of habeas corpus and request for a hearing.

For the reasons set forth below, I respectfully recommend that the petition be denied.

## II. Background

### A. Facts Leading to Petitioner's Conviction and Petitioner's Trial

Petitioner was arrested on July 25, 1999 in connection with an undercover narcotics operation in the vicinity of 145th Street and Eighth Avenue in New York County.

Undercover police officers arrested petitioner after they allegedly observed him selling cocaine to Kenneth Jones and Joyce Dixon, both of whom were also arrested in connection with those sales. Petitioner was subsequently charged with two counts of criminal sale of a controlled substance in the third degree and two counts of criminal sale of a controlled substance in or near school grounds based on the sales to Jones and Dixon.

On August 30, 1999, Raymond Loving, Esq. was appointed to represent petitioner (Respondent's Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus ("Resp. Mem."), Docket Item 4, at 2). Petitioner was initially tried on the charges in January, 2000. That trial, however, ended in a

mistrial after the jury was unable to reach a verdict (Petition for Writ of Habeas Corpus ("Pet."), Docket Item 2, at 2).

In April, 2000 petitioner, again represented by Loving, was retried before the Honorable Marcy L. Kahn, Justice of New York State Supreme Court, New York County and a jury. The prosecution offered the following evidence.

The prosecution presented testimony that on July 25, 1999, Detectives Allen Ford, James Douglas,[1] and Christopher Rock and Officers Curtis Grimes and Alejandro Escobar were part of a police field team organized to target drug deals in central Harlem. Ford, Douglas and Grimes were working in undercover capacities from an unmarked police vehicle parked on Bradhurst Avenue between 145th and 146th street. Rock and Escobar were assigned to back up the undercover officers (Tr. 411-13, 503).

Ford testified that when he approached petitioner and asked "[W]hat's going on?," petitioner responded "No, I don't know you. Nothing happening. I don't got nothing" (Tr.[2] at 503-04). Ford then asked petitioner to take his money and "Give me one," to which petitioner responded, "No . . . I don't know you. I am not selling to you" (Tr. at 504). Ford returned to his vehicle and radioed the rest of the field team that he had been

---

[1]Detectives "Allen Ford" and "James Douglas" are undercover police officers and were permitted to testify using pseudonyms.

[2]Tr. refers to the State Court Transcript of proceedings in the Supreme Court, County of New York, Docket Items 6 & 7.

unable to make a buy from petitioner, who was standing in front of 2729 Eighth Avenue (Tr. 505-06).

Douglas testified that he observed Ford speak to petitioner from the other side of the street, and that he saw petitioner "waive[] his hand as in a no type of way" (Tr. at 436). Douglas then radioed a description of petitioner and his location to the field team, and saw petitioner walk between 2729 Eighth Avenue and a telephone booth down the block (Tr. at 437-38, 443).

Grimes testified that after he heard Ford's radio transmission, he attempted to buy drugs from petitioner. As Grimes walked towards petitioner, he observed petitioner speaking to Kenneth Jones on the corner of 145th Street and Eighth Avenue. Grimes testified that he was about three or four feet away from petitioner when he saw Jones hand petitioner money and shake hands with petitioner. Jones then walked away carrying a white plastic bag. Grimes testified that he then approached petitioner for a buy, but petitioner yelled "No, get away from me. I don't know you" (Tr. at 580-83). According to Grimes he did not lose sight of Jones between the time Jones handed the money to petitioner and the time Jones was apprehended. Grimes testified that he radioed the field team after he observed Jones and petitioner's transaction (Tr. at 583-85).

On cross-examination, Loving questioned Grimes about his Grand Jury testimony in which he stated that after he ob- served Jones give petitioner money in exchange for a ziplock bag, he radioed a description of the incident to the field team and followed Jones.  In the Grand Jury, Grimes did not mention that he had attempted to purchase drugs from petitioner after he saw Jones do so (Tr. at 608-09, 612-13).  Loving also questioned Grimes about his testimony in petitioner's first trial that he was about a foot closer to petitioner and Jones (Tr. at 622).

Douglas testified that he had observed the transaction between Jones and petitioner, and then saw Grimes approach petitioner (Tr. at 474-75).  Loving questioned Douglas about his testimony at the first trial that petitioner spoke with Grimes before petitioner's transaction with Jones and that Jones had waited for the conversation between Grimes and petitioner to end before he approached petitioner (Tr. at 475-77).  Douglas also testified that he had completed a Daily Activity Report ("D.A.R.") memorializing the times of certain events for that day, but he had been unable to locate it while preparing for trial (Tr. at 484).

Rock testified that in response to Grimes' transmis- sion, he stopped Jones at the corner of 143rd Street and Eighth Avenue, and recovered three plastic bags of crack-cocaine from a cassette tape player that Jones was carrying in a plastic bag

(Tr. at 636-38). While Grimes had testified that he saw Jones walk away from petitioner carrying a ziplock bag, the prosecution offered no testimony that anyone saw Jones place the ziplock bag inside the cassette player.

Ford testified that as the transactions among petitioner, Jones and Grimes transpired, he (Ford) moved the unmarked police vehicle to the other side of the street from where petitioner was standing. Ford stated that when he was approximately fifty feet away from petitioner, he observed Joyce Dixon approach petitioner as he stood by a Chevy Blazer, hand him money, receive a ziplock bag about a half an inch to three quarters of an inch in size, and then walk back in the direction from which she had just come (Tr. at 511-14, 517, 518). Ford testified that he then radioed the field team a description of Dixon and followed Dixon in his vehicle to 147th Street, where she turned on to a one-way street (Tr. at 519-20).

During cross-examination Loving asked Ford how he could see what occurred between petitioner and Dixon if they were behind the parked Chevy Blazer. Ford maintained that his view of the transaction was not obstructed, and on re-direct, Ford stated that petitioner and Dixon's transaction occurred just north of where the Blazer was parked (Tr. at 547-48, 551).

Douglas also testified that he observed Dixon approach petitioner by a Chevy Blazer, speak with him and then walk away

in the direction from which she had come.  He then followed Dixon

on foot, radioed the field team a description of her, and stopped

following Dixon when she was stopped by other officers (Tr. at

452-54, 458).

Officer Escobar testified that he approached Dixon

after hearing her description on his radio.  Escobar testified

that upon making eye contact with Dixon, she tossed aside a

ziplock bag containing a white substance that was later deter-

mined to be crack-cocaine (Tr. at 665-66).  Escobar also testi-

fied to arresting Dixon and petitioner.  He stated that while

frisking petitioner for weapons, he recovered $129 in cash but no

drugs.  Escobar then searched the area where petitioner had been

standing, but did not find any narcotics (Tr. at 671, 675, 690-

92).

The defense presented no witnesses.  In his summation

Loving emphasized the inconsistencies and contradictions among

the prosecution witnesses' testimony.  Loving reminded the jury

of Grimes' testimony that petitioner had handed Jones a ziplock

bag, that he (Grimes) did not lose sight of Jones until after he

was apprehended, and that when Jones was arrested the bags of

crack-cocaine were found inside a cassette player that was inside

a plastic bag (Tr. at 747).  Loving also pointed out the incon-

sistencies in the prosecution's testimony concerning where the

transaction with Dixon had occurred (Tr. at 757).  In addition,

Loving stressed the fact the no drugs were recovered from petitioner (Tr. at 761).

The jury found petitioner guilty of one count of criminal sale of a controlled substance in the third degree and one count of criminal sale of a controlled substance in or near school grounds, both findings being based on the sale to Dixon. The jury acquitted petitioner of the charges arising out of the alleged sale to Jones.

B.    Post-Verdict Motions

Before Justice Kahn imposed sentence, petitioner filed, and Loving adopted, a _pro se_ motion to set aside the verdict, pursuant to New York Criminal Procedure Law Section 330.30. Petitioner's 330.30 motion argued that (1) the police officers testified falsely at his trial, (2) he was arrested and searched without probable cause and (3) the evidence presented at trial was insufficient to establish petitioner's guilt.  Justice Kahn denied petitioner's motion on all grounds and sentenced petitioner to two concurrent sentences of four and one-half to nine years (May 15, 2000 Tr. at 5-7, 13-14).

Petitioner timely appealed his conviction to the Appellate Division, First Department (Petitioner's Brief to the Appellate Division ("App. Brief"), annexed as Exhibit A to Declaration of Michelle Maerov in Opposition to Petition for a

Writ of Habeas Corpus ("Maerov Decl."), Docket Item 5).  Peti-
tioner asserted four claims on direct appeal:  (1) the Trial
Court erred in finding that there was probable cause for peti-
tioner's arrest; (2) the verdict was against the weight of the
evidence; (3) the Trial Judge erroneously instructed the jury
that petitioner committed the crimes charged and (4) petitioner's
conviction for criminal sale of a controlled substance in the
third degree should be vacated, in the interests of justice, as a
non-inclusory concurrent count of criminal sale of a controlled
substance in or near school grounds (App. Brief at 9, 16, 20, 23,
annexed as Exhibit A to Maerov Decl.).  The Appellate Division
unanimously affirmed petitioner's conviction on April 18, 2002.
People v. Moore, 293 A.D.2d 356, 740 N.Y.S.2d 201 (1st Dep't.
2002).

        Petitioner sought leave to appeal to the New York Court
of Appeals by a letter dated May 22, 2002, asserting:  (1) that
there was an unresolved issue of law regarding whether the
arresting officer had probable cause to arrest petitioner and (2)
that the Appellate Division erred in rejecting, without comment,
petitioner's claim that the Trial Court's jury instruction
deprived him of his right to a fair trial by an impartial jury
(Letter of Brian Stull, Esq. to the New York Court of Appeals,
dated May 22, 2002, at 1-8, annexed as Exhibit E to Maerov
Decl.).  The Court of Appeals denied petitioner leave to appeal

on July 23, 2002.  <u>People v. Moore</u>, 98 N.Y.2d 700, 776 N.E.2d 7, 747 N.Y.S.2d 418 (2002).

On April 3, 2003, petitioner filed a motion to vacate his conviction pursuant to New York Criminal Procedure Law Section 440.10, asserting that he had been denied the effective assistance of trial counsel, in violation of both the United States and the New York Constitutions (Petitioner's § 440.10 Motion ("440.10 Motion"), annexed as Exhibit G to Maerov Decl.). Petitioner based his motion on trial counsel's failure to interview and call Joyce Dixon, who would have testified that she did not purchase crack from petitioner.  Petitioner attached an affidavit from Dixon, in which she stated that the man from whom she purchased crack on July 25, 1999 was five feet, four inches tall, in his early twenties, dark-skinned, had a tattoo on the right side of his neck and face, and looked nothing like petitioner.  Dixon asserted that when she was arrested on July 25, 1999, she saw several men in custody but not the man from whom she had purchased crack.  She also stated that she did not use any drugs that day and that she remembered the day well.  Dixon claimed that the first time she met petitioner was several weeks before she signed the affidavit, that she had never spoken with an attorney about petitioner's case before 2002, that she had lived at the same address since that arrest and that she would have testified at petitioner's trial had she been asked (Affida-

vit of Joyce Dixon, sworn to Dec. 18, 2002 ("Dixon Aff.") at ¶¶ 4-13, annexed as Exhibit B to 440.10 Motion).

Petitioner also submitted an affidavit asserting that he had consistently proclaimed his innocence to Loving and had requested that Loving fully investigate his case (Affidavit of Robert Moore, sworn to March 26, 2003 ("Moore Aff.") at ¶ 3, annexed as Exhibit C to 440.10 Motion).

The attorney who represented petitioner in connection with the 440.10 motion, Brian Stull, submitted his own affirmation. Stull stated that when he contact Loving concerning petitioner's case, Loving admitted to never interviewing Dixon and to having no strategic reason for failing to do so, as it was his ordinary practice to interview the buyer in a drug-sale case. According to Stull, Loving declined to sign an affirmation attesting to the foregoing facts because Loving was concerned petitioner could use it against him in a malpractice action. Loving agreed, however, that, if called, he would testify at a hearing (Affirmation of Brian W. Stull, Esq. in support of Petitioner's 440.10 motion, dated April 2, 2003, ("Stull Affirm.") at ¶¶ 23- 25, 28-30).

In a written decision dated August 1, 2003, Justice Kahn denied petitioner's 440.10 motion to vacate the judgment, or in the alternative, for a hearing, on the ground that petitioner's claim was procedurally barred by Criminal Procedure Law

Section 440.10(3)(a). Justice Kahn stated that petitioner "failed to place on the record facts which form the basis of his claim of insufficient investigation, despite having numerous opportunities to do so prior to the imposition of sentence." (440.10 Decision and Order ("440.10 Decision") at 17-19, annexed as Exhibit K to Maerov Decl.). These opportunities occurred: (1) during and after petitioner's first trial, (2) during petitioner's second trial and (3) in petitioner's "extensive" pro se 330.30 motion to set aside the verdict. Justice Kahn further found that had petitioner placed his complaint about Loving's performance on the record, "the court could have considered it on [petitioner's] post-verdict motion and the issue would have been preserved for appellate review" (440.10 Decision at 17-18).

After stating that petitioner's motion was subject to summary denial on this procedural ground, Justice Kahn concluded "[e]ven if this court were to consider [petitioner's] motion on the merits, however, the motion must be denied" (440.10 Decision at 19). Justice Kahn then evaluated and rejected petitioner's claims under the state standard of "meaningful representation" and under both the deficient performance and prejudice prongs of the federal Strickland standard (440.10 Decision at 19-30).

In support of her conclusions, Justice Kahn stated that Loving was an effective advocate because Loving's representation, which included several pre-trial motions, active participation in

12

the voir dire of the jury, thorough opening and closing state-
ments, and vigorous cross-examination of prosecution witnesses,
resulted in a hung jury in the first trial and, in the second
trial, an acquittal of the charges based on the alleged sale to
Jones (440.10 Decision at 19-20).  Justice Kahn added that,
considering Dixon's criminal history and the likelihood that the
prosecution would challenge her credibility on several grounds,
Loving could have had strategic reasons for not wanting to call
Dixon as a witness (440.10 Decision at 23-24).  Justice Kahn also
concluded that if Dixon had testified, "she would not have made a
sufficiently credible witness to create a reasonable probability
that the result of the proceeding would have been different"
(440.10 Decision at 27).  Justice Kahn added that defendant was
not entitled to a hearing because he had not shown that Loving
lacked reasonable strategic reasons for proceeding as he did
(440.10 Decision at 30).

Petitioner sought leave to appeal Justice Kahn's
decision to the Appellate Division (Application for Leave to
Appeal 440.10 Decision to the Appellate Division, annexed as
Exhibit L to Maerov Decl.).  The Appellate Division denied leave
to appeal on September 30, 2003 (Certificate Denying Leave, dated
Sept. 30, 2003, annexed as Exhibit O to Maerov Decl.).

On October 2, 2003, petitioner's counsel, Stull,
requested reconsideration of the denial of leave to appeal on the

ground, _inter alia_, that Justice Kahn's decision was based on an erroneous interpretation of state procedural law.  Stull argued that Justice Kahn's finding of a procedural bar was erroneous because petitioner's claim of ineffective assistance of counsel would not have been cognizable in a post-verdict 330.30 motion. (Letter of Brian Stull, Esq. to the Appellate Division, dated October 2, 2003, annexed as Exhibit P to Maerov Decl.).  After the Appellate Division rejected Stull's letter as being in the wrong format, petitioner filed a formal motion for reconsideration (Petitioner's Motion to the Appellate Division for Reconsideration, dated Nov. 3, 2003, annexed as Exhibit Q to Maerov Decl.).  On December 18, 2003, the Appellate Division denied the motion without opinion (Certificate Denying Leave, dated Dec. 18, 2003, annexed as Exhibit T to Maerov Decl.).  The New York State Court of Appeals denied petitioner's application for leave to appeal on the ground that the Appellate Division's order was "not appealable" (Certificate Dismissing Application, dated Feb. 5, 2004, annexed as Exhibit U to Maerov Decl.).

Petitioner submitted his _pro se_ petition for a writ of habeas corpus on March 3, 2004.

C.   Petitioner's Claim

Petitioner challenges his conviction on the sole ground that he was denied the effective assistance of trial counsel,

repeating the claim he asserted in his 440.10 Motion.  Specifi-
cally, petitioner asserts that his trial counsel -- Loving -- was
ineffective for failing to interview and call Joyce Dixon, who
would have denied purchasing crack from petitioner.  Petitioner
also asserts that the state court's denial of his 440.10 Motion
to vacate was an unreasonable application of clearly established
federal law as set forth in the Supreme Court's decisions in
<u>Wiggins v. Smith</u>, 539 U.S. 510 (2003), <u>Strickland v. Washington</u>,
466 U.S. 688 (1984), and <u>Williams v. Taylor</u>, 529 U.S. 362 (2000)
(Pet. at 2, 15-16).

    D.  <u>Proceedings to Date</u>

      On February 5, 2008 I issued a Memorandum Opinion and
Order, familiarity with which is assumed, and which I incorporate
by reference herein.  In that Order, I concluded that (1) respon-
dent had waived any defense of procedural bar by failing to
assert it; (2) the state court's decision, which concluded that
petitioner's ineffective assistance claim was procedurally barred
and would have to be denied on the merits if it were not proce-
durally barred, did not constitute a decision on the merits of
petitioner's claim pursuant to <u>Bell v. Miller</u>, 500 F.3d 149, 155
(2d Cir. 2007); (3) petitioner had satisfied the first prong --

deficient performance -- of the two-part <u>Strickland</u>[3] test by
which a claim of ineffective assistance is evaluated and (4) a
hearing was necessary to determine whether counsel's failure to
interview and call Dixon resulted in prejudice to petitioner,
sufficient to satisfy the prejudice prong of the <u>Strickland</u> test.
In addition, although I determined in my February 5 Order that
petitioner had satisfied the first prong of the <u>Strickland</u> test,
I invited the parties to make any further submissions they deemed
appropriate concerning the performance prong.

After appointing counsel for petitioner, I held a
hearing on May 28, 2008 at which petitioner offered testimony
from Dixon and respondent offered testimony from Loving.

Dixon's testimony at the hearing was generally consis-
tent with her 2002 affidavit. She testified that she remembered
her July 25, 1999 arrest and that she did not purchase drugs from
petitioner that day (Hr.[4] at 3-4). Dixon testified that she
purchased drugs that day from another man, "Speedy," from whom
she "always" bought her drugs (Hr. at 4-6). Dixon also testified
that petitioner's trial counsel never contacted her, that she had
never heard of petitioner until she was contacted by his appel-
late counsel in 2002 and that, if asked, she would have testified

---

[3]<u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 688 (1984).

[4]Hr. refers to the Transcript of proceedings held before me
on May 28, 2008, Docket Items 18 & 21.

at petitioner's trial concerning her drug purchase on July 25, 1999 (Hr. at 5-6, 12-13). When questioned about her background, Dixon admitted that she had been convicted of shoplifting nine times between 1982 and 1985, (Hr. at 7), that she had been convicted of controlled substance offenses nine times between 1986 and 2003, (Hr. at 8), and that she had used a false name in connection with at least one of her arrests (Hr. at 9). Dixon, who was 53 at the time of the hearing, also testified that she had used drugs since she was 12, that she was addicted to drugs, and that she had smoked crack a week before the hearing (Hr. at 6, 8, 10). Even though her testimony lasted no more than approximately one-half hour and the cross-examination was not aggressive, Dixon seemed agitated at times (see Hr. at 8, 10, 12, 14, 15-16, 18).

Dixon's testimony concerning when she first met petitioner was inconsistent. Although Dixon had asserted in her December 2002 affidavit that she had met petitioner for the first time several weeks prior to the date of the affidavit, (Dixon Aff. ¶¶ 6, 7), Dixon repeatedly testified at the hearing that she had not met petitioner until 2008 (Hr. at 13, 19). During cross-examination, Dixon initially stated that the first time she met petitioner was approximately one month before the hearing, (Hr. at 13), but later denied ever meeting petitioner before the day of the hearing (Hr. at 19). On re-direct Dixon stated that she

had met petitioner at Sporn's office several weeks earlier (Hr. at 19-20).

Loving testified that he had been a criminal defense attorney with The Legal Aid Society for nine years, where he tried both felony and misdemeanor cases (Hr. at 22). He subsequently opened his own practice before being assigned to petitioner's case (Hr. at 22-23).[5] At the time of petitioner's trial, Loving had completed approximately forty criminal trials, about half of which involved alleged drug sales (Hr. at 24). Loving testified that he and petitioner had a "good rapport," and that prior to the second trial, petitioner provided him with a document several pages long critiquing the inconsistent testimony given by members of the Police Department during the first trial (Hr. at 24-25).

Though Loving initially stated that petitioner's defense was misidentification, Loving later explained that he had mis-spoken and that petitioner's defense, rather, was "what the police officers had witnessed wasn't a drug sale" (Hr. at 27). Admitting that he had not taken any steps to interview either of the alleged buyers to whom petitioner was charged with selling drugs, Loving explained that, contrary to the affidavit submitted

---

[5]While in private practice, Loving continued his criminal defense practice, primarily receiving cases through the state supreme court's 18-B [assigned counsel] panel (Hr. at 22-23).

by Stull, he had strategic reasons for not pursuing the buyers as witnesses (Hr. at 26).  Specifically, Loving stated,

> I didn't anticipate that [petitioner] was going to testify at what turned out to be two trials.  Conse- quently, it didn't make any sense to me . . . to put the buyer on the stand to testify if I wasn't going to call [petitioner].  In my opinion, that wouldn't have looked good to the jury.  The jury, of course, would be under instructions that -- they are to disregard the fact about whether or not a defendant testifies in a criminal trial, but, nevertheless, people are human and jurors are human and you have to make . . . strategic judgments about how the jury is going to view your case

(Hr. at 26-27).  Loving testified that it is not his ordinary practice to interview buyers in drug sale cases because deciding whether to interview an alleged buyer requires a "case-by-case analysis;" he also denied ever telling Stull that it was his ordinary practice to interview buyers (Hr. at 36, 41-42).

Although Loving recalled being concerned that peti- tioner's record of convictions would be introduced if he had testified,[6] Loving could not specifically recall his discussions with petitioner about testifying nor could he remember if he had advised petitioner not to take the stand (Hr. at 29, 34-35, 46). Loving recognized, however, that, because it was ultimately petitioner's decision whether to testify, petitioner could have decided to take the stand at the end of the prosecution's case

_____

[6]As a result of petitioner's <u>Sandoval</u> hearing, the Trial Court concluded that if petitioner testified, the prosecution could introduce petitioner's prior felony and misdeamenor convictions (Hr. at 29).

(Hr. at 29).  Loving also testified that while a buyer's trial
testimony that she did not purchase her drugs from petitioner
could have helped the defense, Dixon might not have been a good
witness because of her criminal history (Hr. at 35).  Loving,
however, could not recall how or when he became aware of Dixon's
criminal history; he did not know if he was aware of it at the
time of petitioner's second trial (Hr. at 40).

Following the hearing, respondent submitted
supplemental memoranda addressing petitioner's ineffective
assistance of counsel claim in light of the hearing testimony,
and petitioner submitted a letter in reply to respondent's
memoranda.

## III.  Analysis

Based on the testimony offered at the hearing, I
conclude that petitioner has not met the prejudice prong of the
Strickland test.  As noted in my February 5, 2008 Memorandum
Opinion and Order, the second prong of the Strickland test --
actual prejudice -- requires the petitioner to show that, but for
trial counsel's errors, there is a "reasonable probability" that
the result of the trial would have been different.  "A reasonable
probability is a probability sufficient to undermine confidence
in the outcome."  Strickland v. Washington, supra, 466 U.S. at
694.

In making the "reasonable probability" determination:

> [A] court hearing an ineffectiveness claim must con-
> sider the totality of the evidence before the judge or
> jury. Some of the factual findings will have been
> unaffected by the errors, and factual findings that
> were affected will have been affected in different
> ways. Some errors will have had a pervasive effect on
> the inferences to be drawn from the evidence, altering
> the entire evidentiary picture, and some will have had
> an isolated, trivial effect. Moreover, a verdict or
> conclusion only weakly supported by the record is more
> likely to have been affected by errors than one with
> overwhelming record support. Taking the unaffected
> findings as a given, and taking due account of the
> effect of the errors on the remaining findings, a court
> making the prejudice inquiry must ask if the defendant
> has met the burden of showing that the decision reached
> would reasonably likely have been different absent the
> errors.

Strickland v. Washington, supra, 466 U.S. at 695-96; accord Lynn v. Bliden, 443 F.3d 238, 248 (2d Cir. 2006).

Based on Dixon's testimony at the hearing and her demeanor on the stand, I conclude that if Loving had interviewed her, he would not have called her and that even if he had called Dixon, her testimony would not have undermined confidence in the outcome of petitioner's trial.

As set forth above, Dixon is, unfortunately, a life-long drug addict with multiple theft and drug convictions and, on at least one occasion, has intentionally impersonated another individual to deceive law enforcement officials. Admittedly, there is no way of knowing with precision what her condition was at the time of petitioner's trial, but at the hearing she appeared to become agitated in response to relatively mild ques-

21

tioning, and she appeared to be extremely uncomfortable on the witness stand.  She presented as an addict in need of drugs, and I believe the jury would have perceived her as such.  In light of her criminal record and life-long addiction to drugs, had Loving interviewed Dixon, he probably would have concluded that she was too unstable and unreliable to call as a witness.

Moreover, if Dixon had been called, it is unlikely that her testimony would have undermined confidence in the outcome of the trial.  Although the evidence against petitioner cannot be characterized as overwhelming, the evidence was not insubstantial.  For example, when Detective Ford attempted to purchase narcotics from petitioner, petitioner did not deny that he was selling drugs or deny knowledge of the nature of Ford's question.  Rather, petitioner responded "No, I don't know you.  Nothing happening.  I don't got nothing" (Tr. at 503-04).  When Ford made a second effort, asking petitioner to take his money and "Give [Ford] one," petitioner responded, "No . . . I don't know you.  I am not selling to you" (Tr. at 504).  When Officer Grimes subsequently attempted to buy drugs from petitioner he received a similar response, namely "No, get away from me.  I don't know you" (Tr. at 580-83).  Petitioner's responses suggest that he knew exactly what the officers were seeking, but that petitioner would not sell drugs to them because he did not know them.  Although subtle, these statements from petitioner constitute

compelling evidence that he was engaged in narcotics trafficking. This evidence, along with the testimony concerning the hand-to-hand transaction between Dixon and petitioner and the recovery of narcotics from Dixon, was more than sufficient evidence of petitioner's guilt.

Given Dixon's personal history, I do not believe that her testimony undermines the result of petitioner's trial. In light of her long history of drug abuse and violations of the law and her demeanor at the evidentiary hearing, her testimony would not have been at all persuasive. See Aponte v. Scully, 740 F. Supp. 153, 158 (E.D.N.Y. 1990). Thus, petitioner has failed to establish that had Dixon testified in his defense at trial, there is a reasonable probability Dixon's testimony would have changed the outcome of the trial. Because petitioner has not shown he was prejudiced by his counsel's failure to investigate Dixon, his habeas claim should be denied. See Moss v. Hofbauer, 286 F.3d 851, 868 (6th Cir. 2002) (Where the uncalled witness had appeared wholly incredible at petitioner's evidentiary hearing and "would have been subject to impeachment if [she] had testified at [petitioner's] trial . . . no reasonable probability exists that the result at trial would have been any different if [defense counsel] had interviewed [that witness] prior to trial and then called [her] as a witness."); Halo v. United States, 06 Civ. 5041 (ARR)(RLM), 2007 WL 1299158 at *5, *12 (E.D.N.Y. Apr. 30, 2007)

(Petitioner's decision not to testify at his trial was not prejudicial where, based on the magistrate's observations of petitioner at in-court conferences, petitioner would not have been a credible witness and the prosecution probably would have impeached him with his psychiatric and criminal histories.); Porter v. Horn, 276 F. Supp.2d 278, 358 (E.D.Pa. 2003) (Habeas petitioner failed to show he was prejudiced by counsel's failure to investigate and present an alibi witness, whose testimony at petitioner's evidentiary hearing was neither credible nor consistent with prior statements).

IV.  Conclusion

Accordingly, for all the foregoing reasons, I respectfully recommend that the petition be denied.

In addition, since petitioner has not made a substantial showing of the denial of a constitutional right, I also recommend that a certificate of appealability not be issued.  28 U.S.C. § 2253.  To warrant the issuance of certificate of appealability, "petitioner must show that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Middleton v. Attorneys Gen., 396 F.3d 207, 209 (2d Cir. 2005) (per curiam) (internal quotation marks omitted); see also Love v. McCray, 413 F.3d

192, 195 (2d Cir. 2005) (per curiam). For the reasons set forth above, I conclude that there would be no difference of opinion among reasonable jurists that petitioner's federal rights were not violated.

V. Objections

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from the date of this Report and Recommendation to file written objections. See also Fed.R.Civ.P. 6(a) and 6(d). Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels, United States District Judge, 500 Pearl Street, Room 630, New York, New York 10007, and to the chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Daniels. FAILURE TO OBJECT WITHIN TEN (10) DAYS **WILL** RESULT IN A WAIVER OF OBJEC-TIONS AND WILL PRECLUDE APPELLATE REVIEW. Thomas v. Arn, 474 U.S. 140 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d

Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated: New York, New York
       August 14, 2008

                              Respectfully submitted,

                              HENRY PITMAN
                              United States Magistrate Judge

Copies mailed to:

Michael H. Sporn, Esq.
299 Broadway
New York, New York 10007

Thomas B. Litsky, Esq.
Assistant Attorney General
State of New York
120 Broadway
New York, New York 10271